IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| THE J.M SMUCKER COMPANY, | ) | CASE NO. 5:19CV1646 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | **DECLARATION OF SEAN MURRAY** |
| | ) | **IN SUPPORT OF DEFENDANT** |
| EUROFINS SCIENTIFIC, INC., | ) | **EUROFINS SCIENTIFIC, INC.'S** |
| | ) | **MOTION TO DISMISS OR** |
| DEFENDANT. | ) | **TRANSFER** |

My name is Sean Murray.  I am an adult resident of the State of Iowa.  I have knowledge of the facts and matters stated herein and would and could testify to the same if called to do so.

1.     I have been employed by Defendant Eurofins Scientific, Inc. ("Eurofins" or "ESI") as its President, Food Testing, since December 2016, and I am authorized to make this declaration on behalf of Eurofins. As president of Eurofins Scientific, Inc., I am charged with maintaining the company's business records and I have personally reviewed the records and documents related to Eurofins' relationship with The J.M. Smucker Company.  Therefore, the matters stated in this Declaration and the exhibits thereto are within my personal knowledge and based upon reasonably available information, presently recollected and in business records gathered through the assistance of employees of Eurofins Scientific, Inc., and upon which I have relied as President of Eurofins Scientific, Inc.

2.     ESI is a member of an international group of affiliated laboratories providing a range of testing and support services to the food and consumer product industries, among others, including nutritional analysis and testing of pet food and feed.  ESI's home office and headquarters is located in Des Moines, Polk County, Iowa, in or around which all of its business records, most of its officers and most of the relevant witnesses are located.

1

3.      In November 2016, Smucker entered into a contract with Eurofins relative to certain pet food testing and Smucker's use of Eurofins' online service, Eurofins On-Line ("EOL"), providing 24/7 access to its laboratories, including online order / sample registration and tracking and archival storage of analysis results and test reports among other features.

4.      Specifically, on or about November 22, 2016, Smucker, through its agent Brian Fitchett, affirmatively acknowledged and accepted the EOL account terms and conditions outlined in the Eurofins On-Line Agreement ("EOL Agreement").  Attached hereto as Exhibit A and incorporated herein by reference, is a true and accurate copy of the EOL Agreement entered into between the parties on November 22, 2016.  Further, attached hereto as Exhibit B and incorporated herein by reference, is a true and accurate copy of an Account Terms and Conditions Acceptance Status Summary reflecting Smucker's acceptance of the EOL Agreement under Account Code AUS004640, held in the name of Smucker's subsidiary, Big Heart Pet Brands.

5.      Article 7 of the EOL Agreement expressly incorporates the "most recent version of the ESI [Eurofins Scientific Inc.] Standard Terms and Conditions," available at www.eurofinsus.com ("ESI Standard Terms").

6.      Pursuant to the terms of the EOL Agreement ad ESI Standard Terms, Smucker has regularly submitted orders and requests for service to Eurofins through the EOL over the course of the last three years.

7.      In November 2018, Smucker accessed the EOL and through that website, placed an online order for testing related to Smucker's 9Lives® Protein Plus® wet cat food (the "Cat Food").

8.      On or about December 1, 2018, Smucker sent samples of the Cat Food to Eurofins.

2

9.     The online testing order at issue was submitted and accepted subject to the terms of the EOL Agreement, including the most recent version of the ESI Standard Terms adopted effective October 26, 2018 and expressly incorporated in the EOL Agreement.  Attached hereto as Exhibit C and incorporated herein by reference, is a true and accurate copy of the October 2018 ESI Standard Terms.

10.     The EOL Agreement and October 2018 ESI Standard Terms were part of the parties' contract, which included a forum selection clause requiring all disputes arising out of the agreement be brought exclusively in a court located in and having jurisdiction over Polk County, Iowa.

11.     The initial term of the EOL Agreement was for one year and it has automatically renewed for successive one-year terms thereafter.  The EOL Agreement applies to Smucker's access and use of the EOL, including the submission of orders and data by Smucker to Eurofins and the analytical test results and other data generated by Eurofins for Smucker based on the services requested by Smucker.

12.     At the time of Smucker's initial acceptance of the EOL Agreement on November 22, 2016, the most recent ESI Standard Terms were those adopted effective December 2009, which remained unchanged until March 2018, when the terms were revised to specifically identify each Eurofins affiliate, or member, laboratory.  Otherwise, the ESI Standard Terms remained virtually the same throughout the commercial relationship between Eurofins and Smucker.  A true and accurate copy of the December 2009 ESI Standard Terms is attached hereto as Exhibit D and incorporated herein by reference.  A true and accurate copy of the March 2018 ESI Standard Terms is attached hereto as Exhibit E and incorporated herein by reference.

13.     Pursuant to each iteration of the ESI Standard Terms, Smucker agreed that ESI's standard terms and conditions applied to all orders accepted by Eurofins and that a contract with those terms "comes in to being" whenever an order has been placed with and accepted by Eurofins.

14.     Further, in Paragraph 1.2 of the December 2009 ESI Standard Terms, Smucker agreed that:

> These Terms and Conditions supersede and replace all prior verbal or written price quotations and agreements between the parties and, unless specifically indicated otherwise therein, take precedence over all conflicting or inconsistent provisions of subsequent written agreements between the parties. No officer (other than the Chief Executive Officer of ES), employee, agent or subcontractor of ES has the authority to alter or waive any of these Terms and Conditions or to make any representation which conflicts with or purports to override any of these Terms and Conditions; and no such alteration, waiver or representation shall be binding upon ES, unless it is in writing and signed by the Chief Executive Officer of ES.

15.     Similarly, the March and October 2018 ESI Standard Terms included a substantively identical integration clause, stating that the ESI standard terms and conditions could only be modified, altered, or waived in a writing signed by an "authorized officer of the Member."

16.     In each version of the ESI Standard Terms, Smucker agreed that "unless specifically accepted in a writing and signed" by an authorized officer of Eurofins:

> any terms proposed or submitted [by Smucker] at any time (including, but not limited to, terms or provisions in [a Smucker's] purchase order, instructions or other document) which differ from [the Eurofins Terms] are rejected as a material alteration of [the Eurofins Terms] and shall be of no force or effect. …. Each order accepted by [Eurofins] will be treated as a separate contract between [Eurofins] and [Smucker].

17.     The foregoing terms are substantively the same to those in Eurofins' earlier 2014 contract with Big Heart Pet Brands.  On or about October 21, 2014, Big Heart Pet Brands submitted a New Account Application to Eurofins Analytical Laboratories, Inc. and agreed to Eurofins' General Terms and Conditions of Sale that are nearly identical to the ESI Standard Terms at issue in this case and applied to all orders, took precedence over subsequent proposed terms, and could

4

not be modified by the customer's purchase orders.  Attached hereto as Exhibit F and incorporated herein by reference, is a true and accurate copy of the Eurofins General Terms and Conditions entered into between Eurofins and Big Heart Pet Brands on October 21, 2014.

18.     Big Heart Pet Brands is the former producer and distributor of 9Lives® wet cat food.  Smucker acquired Big Heart Pet Brands in 2015.  Attached hereto as Exhibit F and incorporated herein by reference, is a true and accurate copy of a News Release published by Smucker on is investor website concerning its acquisition of Big Heart Pet Brands.  To this day, Smucker continues to use the Big Heart Pet Brand's Eurofins account numbers to conduct business with Eurofins.

19.     Smucker alleges that on May 10, 2018, it submitted a purchase order to Eurofins for the purchase of various food and feed testing, including cat food testing, followed by a series of alleged change orders supposedly relating back to its original purchase order.  However, Eurofins has undertaken an exhaustive search of its records and has been unable to identify or locate any such purchase order or change orders.

20.     Smucker submitted online orders to Eurofins through the EOL, using Smucker's Big Heart Pet Brands account.  These orders were directed to Eurofins Scientific Inc.'s Des Moines, Iowa office.

21.     In November 2018, Smucker submitted an online testing request to Eurofins through EOL related to thiamine testing of Smucker's Cat Food.  On or around, December 1, 2018, Eurofins received the Cat Food samples sent by Smucker to Eurofins for thiamine testing.  Eurofins tested the samples pursuant to regularly accepted industry standards and practices, at a nominal testing cost, and reported the results to Smucker.  The thiamine testing results indicated low levels

of thiamine, which did not meet minimum requirements.  Smucker did not attempt to verify the test result or request an investigation to confirm or validate the results.

22.     The Smucker Cat Food testing request at issue was submitted by Smucker to Eurofins via EOL under the Big Heart Pet Brands Account Code AUS004640, which is the same account Smucker used when it confirmed its acceptance of the EOL Agreement and the ESI Standard Terms.  Thus, the request at issue was subject to the terms of the EOL Agreement and the most recent ESI Standard Terms in effect at that time, including the forum selection clause therein.

23.     Specifically, in the EOL Agreement, the parties agreed to resolve any dispute "in the courts of the State of Iowa, County of Polk, or if it has or can acquire jurisdiction, in the United States District Court for the Southern District of Iowa…"  Likewise, pursuant to the October 2018 ESI Standard Terms incorporated by reference in the EOL Agreement, the parties agreed to resolve any dispute in "the commercial courts of the State in which the registered office of the Member which accepted the order in question is located."  In this case, the Cat Food samples were received in December 2018 by "Member," Eurofins Scientific Inc., which is headquartered in Des Moines, Polk County, Iowa.  The Eurofins forum selection clauses are part of the parties' contract and apply to Plaintiff's claims.

24.     Each of Smucker's testing requests was submitted through the EOL and none of those requests reflected any objections to the EOL Agreement or the ESI Standard Terms previously accepted by Smucker in November 2016 and applicable to each such order.

25.     No authorized Eurofins officer specifically accepted in writing, or otherwise affirmatively acknowledged, any terms proposed or submitted by Smucker in any alleged purchase order or change order identified in Smucker's Complaint in this action that varied or materially

6

amended the EOL Agreement or ESI Terms, including, but not limited to, the Smucker Terms and Conditions referenced in the Complaint and attached as Exhibit A thereto.  And, Smucker never sought a written amendment to the parties' EOL Agreement and the ESI Standard Terms.

I declare under penalty of perjury under the laws of the United States of America that the foregoing statement of facts and matters is true and correct to the best of my knowledge, information and belief.


Executed on __12-2-2019__          By: _____

EXHIBIT A

**EUROFINS ONLINE**

An Agreement to Provide Access to Web-based Data

This agreement ("Agreement") is between Eurofins Scientific, Inc., having its main office at 2200 Rittenhouse, Suite 175, Des Moines, Iowa, 50321, (hereinafter referred to as "ESI"), and the applicant (hereinafter referred to as "CUSTOMER").

ESI and CUSTOMER agree to the following conditions related to CUSTOMER's access to the Eurofins On-Line system (sometimes referred to herein as "EOL"):

ARTICLE 1 – SUBJECT

CUSTOMER is requesting access to EOL, which contains and presents data submitted by CUSTOMER to ESI or data generated by ESI for CUSTOMER, in particular, the analytical results generated on the basis of the services performed by ESI on behalf of CUSTOMER, (hereinafter collectively referred to as the "Data"), at the URL https://eol.eurofinsus.com (hereinafter called the "EOL site").

ESI will provide CUSTOMER with a mutually agreed upon number of accounts, not to exceed 10 accounts per CUSTOMER, each distinguished by a specifically designated login name and an initial password, allowing CUSTOMER'S staff to be identified and to consult data on the designed EOL site, as described in the user's manual provided to CUSTOMER. CUSTOMER can modify and is required per the terms of this Agreement to change these passwords, through the EOL site.

ARTICLE 2 – TERM

The term of this contract is one year from the date of the signed Agreement between both Parties, with automatic renewal for successive one-year terms, subject to the ability of either party to terminate as set forth in the last sentence hereof. If this document is an amendment to an existing contract, for example a service contract between ESI and CUSTOMER (the "main contract"), notwithstanding any other provision of this contract, the term hereof shall end on the date the main contract ends. Each Party may terminate this Agreement at any time by registered letter sent to the other Party at the address specified above, with sixty (60) days advance notice; provided that ESI may terminate this Agreement at any time by notice upon any breach hereof by CUSTOMER.

ARTICLE 3 – OBLIGATIONS, REPRESENTATIONS AND WARRANTIES OF THE PARTIES

- ESI's Representations and Warranties: ESI represents and warrants:
  - that it has the requisite power and authority to execute, deliver and perform its obligations under this Agreement; and
  - that it will adhere to the terms and conditions of this Agreement.
- ESI's OBLIGATIONS: ESI undertakes to take commercially reasonable efforts to release regularly updated Data on the EOL site. Furthermore, ESI undertakes to implement resources that it considers reasonable to assure (a) the site availability to CUSTOMER, (b) protect confidentiality of the Data, and (c) prevent data access from non-authorized third parties.
- CUSTOMER confirms that he/she has been informed and agrees with the general procedures and the resources defined/allocated by ESI to fulfill its obligations. ESI expressly, and without limitation, does not agree or warrant:
  - That the EOL site/system will be functional at all times,
  - The integrity of the Data,
  - The confidentiality and/or security of the Data, or the impact and/or influence of internal and/or external viruses or other hardware – and/or software-related anomalies.
- EARLY POSTING: Further, it is understood that ESI, with or without CUSTOMER'S permission, will post Data on an ongoing basis, as it is generated. It is understood that this early posting of Data, prior to final review and/or completion of a project, is subject to change. ESI makes no representation or warranty, implied or otherwise, about the integrity, use or application of early-posted results.

DATA POSTED ON THE EOL SITE IS NOT A SUBSTITUTE FOR THE ORIGINAL PRINTED ESI REPORT OF ANALYSIS. CUSTOMER IS CAUTIONED AGAINST RELYING ON THE POSTED DATA IN ANY WAY.

- CUSTOMER's Representations and Warranties: CUSTOMER represents and warrants:
  - that it has the requisite power and authority to execute, deliver and perform its obligations under this Agreement;
  - that it will adhere to the terms and conditions of this Agreement, including all applicable terms which may be incorporated herein, and also abide by all applicable laws;
  - It will not introduce to any ESI system, any code, device, criteria, mechanism or function which may be used to restrict, damage, destroy or otherwise shut down or alter any portion of an ESI system;
  - It will not introduce to any ESI system, any malicious codes, commands, instructions, programs or other internal components (e.g., a computer "virus," computer "worm," "time bomb," "Trojan horse," "backdoor," or "malware");
  - It will take reasonable steps, including those required under this Agreement, to protect the ESI system; and
  - It will not use EOL site or any other ESI system to violate, infringe, or misappropriate the intellectual property rights of ESI or any third party.
- CUSTOMER'S OBLIGATIONS: CUSTOMER obligations are stated below:
  The CUSTOMER shall:
  - Appoint a person to act as a liaison between ESI and CUSTOMER,
  - Modify without delay the initial account(s) passwords(s) immediately upon receipt from ESI,
  - Frequently modify these passwords(s). ESI recommends CUSTOMER change password(s) at least once per month, and to maintain and frequently update an authorized user list.
  - Choose complex passwords, including a combination of figures, letters, and other characters to avoid possible duplication,
  - Never use the same password more than one time sequentially,
  - Communicate the passwords only to duly authorized company staff,
  - Not write down these passwords on media easily accessible to non-authorized third parties (in particular in electronic mails, or any other electronic medium accessible in public network(s) other than the EOL site itself).
  - Not attempt to access data other than its own Data or data generated through ESI services performed on its behalf.
- Unauthorized access to accounts other than that of CUSTOMERS could result in termination of on-line data access.
- Moreover, it is the CUSTOMER's responsibility to ensure that if one or more of its employee(s) and/or agent(s) who has/have been given access to an EOL account leave(s) the employment of the CUSTOMER or for any reason should no longer have, access to the Data, the employee(s) or agent(s) no longer accesses said Data. CUSTOMER undertakes to inform ESI in writing of access accounts to be closed. CUSTOMER acknowledges that ESI may not be able to ensure immediate closure of an account. Failure of CUSTOMER to notify ESI of necessary account deletion does not entitle CUSTOMER to any remedy whatsoever.

EXHIBIT A

- ILLICIT ACCESS: CUSTOMER is aware and acknowledges that, because of the use of the Internet, ESI cannot prevent, with absolute certainty, non-authorized third parties, either voluntarily or fortuitously, from accessing the Data, despite all the safety and protective means implemented by ESI.

EXCEPT AS OTHERWISE EXPRESSLY STATED HEREIN, THE PARTIES DISCLAIM ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY EXPRESS OR IMPLIED WARRANTIES THAT THE DATA IS TRUE, CORRECT, COMPLETE, SECURE, AND FREE OF ERRORS, AND ANY EXPRESS OR IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE AND MERCHANTABILITY

ARTICLE 4 – RESPONSIBILITY

- LIMITED GUARANTEE: ESI agrees to exercise commercially reasonable efforts to cause the ESI On-Line service to function under use in normal conditions in compliance with the performances requested by the computer systems and the internet networks. ESI shall not be responsible for any defect originating from an accident or from an improper use. Moreover, ESI does not agree to provide any specific assistance concerning the use of the Internet.

- CUSTOMER'S RECOURSE: ESI does not warrant or guarantee against the defectiveness or loss of Data of or by CUSTOMER. CUSTOMER is expected to electronically back up or keep paper records of the data provided independently of the ESI On-Line Service. ESI only provides through this Agreement a data access service for CUSTOMER'S use.

- ABSENCE OF RESPONSIBILITY/LIMITATION ON LIABILITY: Subject to the restrictions set forth above, CUSTOMER agrees to indemnify, defend and hold harmless ESI and its affiliates (current and future), employees, officers and directors from and against all actions, proceedings, claims, demands, loss, damage, penalty cost (including, without limitation, reasonable attorneys' fees) or expense to CUSTOMER arising from access to its Data via the On-Line service (including attorney fees), or any use which could follow directly from third parties, and also the direct or indirect damages caused by such a use, including any claims from suppliers as referenced in the section entitled "SUPPLIERS" below. ESI assumes no liability, expressed or implied, and does not accept responsibility for any claim that arises from this Agreement, and will not be responsible in case of CUSTOMER's non-fulfillment of its obligations.

  Furthermore, CUSTOMER further agrees to indemnify, defend and hold ESI, its affiliates (current and future), employees, officers and directors from and against all actions, proceedings, claims, demands, loss, damage, penalty cost (including, without limitation, reasonable attorneys' fees) or expense arising in connection with CUSTOMER's use of the EOL site or system or in any way related to CUSTOMER's obligations under this Agreement, including, without limitation, its obligations, representations, and warranties, except for those losses, claims, and liabilities arising out of the willful misconduct of ESI. ESI SHALL NOT BE LIABLE TO CUSTOMER FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY KIND, INCLUDING BUT NOT LIMITED TO, ANY LOSS OF USE, LOSS OF BUSINESS, OR LOSS OF PROFIT. ANY ESI LIABILITY TO CUSTOMER FOR ANY DAMAGES OF ANY KIND STEMMING FROM THIS AGREEMENT AND THE EOL SITE OR SERVICE SHALL NOT EXCEED, IN AMOUNT, THE SUM EQUIVALENT TO THE AMOUNT PAYABLE BY CUSTOMER TO ESI FOR ACCESS TO THE EOL SITE UNDER THIS AGREEMENT.

- ACCESS TO THE ACCOUNTS LIST: CUSTOMER has the right to access the list of accounts permitted to browse the Data on the EOL site. In such case, CUSTOMER must request in writing such list from ESI. However, ESI will not communicate the associated passwords, but ESI will substitute them, particularly in case of loss of the password.

- SUPPLIERS: The publication of the Data relating to the CUSTOMER may in certain circumstances relate to one or more suppliers of the CUSTOMER, within the framework of conventions that define the property and the access to this Data. All relations with any such other supplier shall be the responsibility of CUSTOMER, and CUSTOMER expressly agrees CUSTOMER shall be responsible for any complaint from any such supplier disputing the publication of such Data, as well as damage resulting from an illicit access to this data, as set forth in the section "ABSENCE OF RESPONSIBILITY" above.

ARTICLE 5 – SURVIVAL

Upon any termination or expiration of this Agreement, ESI has 30 days to remove CUSTOMER'S Data from the EOL site, and to close the accounts, and Articles 3 – OBLIGATIONS OF THE PARTIES and 4 – RESPONSIBILITY shall survive the termination or expiration of this Agreement.

ARTICLE 6 – GOVERNING LAW; JURISDICTION

This Agreement is governed by Iowa law, except for the application of conflicts of law principles. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement shall be brought exclusively in the courts of the State of Iowa, County of Polk, or, if it has or can acquire jurisdiction, in the United States District Court for the Southern District of Iowa, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein. Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world by registered mail or otherwise. Each party hereto irrevocably and unconditionally waives and agrees not to plead or claim in any court that any action, suit or proceeding brought in the courts identified in the second sentence in this Article 6 has been brought in an inconvenient forum.

ARTICLE 7 – ESI STANDARD TERMS AND CONDITIONS

The most recent version of the ESI Standard Terms and Conditions is applicable to all activities described herein and is available at www.eurofinsus.com.

ARTICLE 8 – NOTIFICATION

All written notices should be sent via registered mail, return receipt requested. The designated recipient of such notices for the purposes of this Agreement is:

EUROFINS SCIENTIFIC, INC.
2200 Rittenhouse Street, Suite 175
Des Moines, IA 50321
ATTN: EOL Contract Department

EXHIBIT A

EXHIBIT B

## Account Terms & Conditions Acceptance Status

| Account Name | Account Code | CRM Account Created On | Client Code | eLIMS Client Created On | Lab S Code | Lab S Name | EOL T&C Agreed On |
|---|---|---|---|---|---|---|---|
| Big Heart Pet Brands | AUS004640 | 1/22/2016 8:29:04 PM | QD0001582 | 10/27/2005 10:09:17 AM | EUMEDM | Eurofins Scientific Inc. (Des Moines) | 11/22/2016 4:28:35 PM |
| Big Heart Pet Brands | AUS004640 | 1/22/2016 8:29:04 PM | QA0004625 | 5/2/2013 7:54:21 AM | EUUSNO | Eurofins Central Analytical | 11/22/2016 4:28:35 PM |

EXHIBIT B

EXHIBIT C



# General Terms & Conditions of Sale

## 1. Area of Application

1.1 All Orders accepted by Eurofins Scientific, Inc., Eurofins Analytical Laboratories, Inc., Eurofins Microbiology Laboratories, Inc., Eurofins DQCI, LLC, Eurofins Craft Technologies, Inc. and Eurofins SF Analytical Laboratories, Inc., which includes the additional business lines of Eurofins Nutritional Analysis Center, Eurofins Supplement Analysis Center, Eurofins Food Safety Systems, Eurofins Grain Testing, Eurofins Central Analytical Laboratories and Eurofins Genescan, or any of their subsidiaries or Affiliates (as hereinafter defined) (each, individually, a "Member" and all Members hereinafter collectively referred to as the "US Food Entity") from the undersigned ("Client") will be governed by these General Terms and Conditions of Sale (the "Terms"), including orders placed by telephone which have not been confirmed in writing and orders made by delivery of samples. A contract with these Terms comes into being when an order that has been placed with any Member of the US Food Entity, and the order is accepted by such Member of US Food Entity. An order placed with a Member of US Food Entity is considered as accepted by such Member of US Food Entity when (a) the Member proceeds to fulfil that order, without need for any written confirmation from the Member or (b) the Member accepts the order in writing.

1.2 These Terms supersede and replace all prior verbal or written price quotations and agreements between the parties and, unless specifically indicated otherwise therein, take precedence over all conflicting or inconsistent provisions of subsequent written agreements between the parties. No employee, agent or subcontractor, other than the authorized officer(s) of the Members, has the authority to alter or waive any of these Terms or to make any representation which conflicts with or purports to override any of these Terms; and no such alteration, waiver or representation shall be binding upon any Member, unless it is in writing and signed by an authorized officer of the Member.

1.3 For the purpose of the foregoing, "Affiliate" shall mean any corporation or other business entity directly or indirectly controlled by, controlling, or under common control with any Member of US Food Entity and/or Client. The term "control" (including, with correlative meaning, the terms "controlled by," "controlling" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a party, whether through the ownership of voting securities, by contract or otherwise, or such other relationship as, in fact, constitutes actual control.

1.4 US Food Entity is not a separate and distinct entity, but rather a group of independent affiliated laboratories that perform food and feed testing services for the purpose of providing safety, composition, authenticity, origin, traceability and purity of food (the "Services"). The Members and their respective Affiliates, and Client and its Affiliates, are separate and distinct legal entities. In no event shall any Member or its Affiliates, be jointly and severally liable with any other Member or any other Affiliates of any Member, in any respect under this Agreement, nor be deemed to have any obligation with respect to any other Member's or Affiliate's performance or non-performance of any obligation under this Agreement.

## 2. Placement of Order

2.1 Client's order will be valid only if it is sent by mail or fax or other electronic message on letterhead of the Client or by using US Food Entity-approved sample dispatch sheets or electronic order forms and the commercial aspects of the order which are not specifically set out in these Terms (Including price, estimated turnaround times and delivery date) must be agreed at the time of the order. Client must confirm in writing orders given by telephone immediately after they are made and will be deemed to have placed an order if Client sends samples to a Member quoting the Client reference. The Member is not obligated to start any analytical work unless the order is clear and it has been provided with all required information.

EXHIBIT C



2.2 Unless specifically accepted in writing and signed by an authorized officer of the Member, any terms proposed or submitted by a Client at any time (including, but not limited to, terms or provisions in the Client's purchase order, instructions or other document) which differ from these Terms are rejected as a material alteration of these Terms and shall be of no force or effect. Furthermore, special terms or conditions of prior orders, including special pricing, will not automatically apply to subsequent orders. Each order accepted by a Member will be treated as a separate and independent contract between such Member and the Client.

2.3 The Member is entitled to charge management and administrative fees of up to Twenty-Five Dollars ($25) in connection with the request for additional services to an existing order. A request for additional services on samples that have entered the laboratory will be treated as a new order and may postpone estimated delivery date accordingly.

2.4 Any logistic service off-site of the laboratory must be paid in full, unless it has been cancelled or modified by the Client at least forty-eight hours (48) in advance for collection services, ninety-six (96) hours in advance for sampling services and one (1) week in advance for auditing services.

## 3. Price and Terms of Payment

3.1 If the acknowledgment of an order does not state otherwise, the Member's prices apply "ex works", excluding packaging, which is charged separately. Any additional cost or disbursement (e.g. Incurred by the Member in connection with the order) must be paid by the Client.

3.2. Prices are exclusive of all applicable taxes (including sales, use and VAT) and are based on tariffs in force at the day of the remittance of the offer to the Client. Applicable taxes are those in force at the date of invoicing.

3.3 Unless specifically agreed otherwise by the Member in its acceptance of an order, payment of all invoices is due strictly within 30 days of the invoice date; any dispute about invoices must be raised within 30 days of the invoice date, by providing written notice to Member with reasonable detail of the dispute. The challenge of an analytical result will not entitle the Client to defer payment. Any invoice which remains outstanding after due date, may be additionally charged with an administrative penalty of Seventy-Five Dollars ($75) and may carry interest at the rate of one percent (1%) per month or the maximum interest rate permitted by applicable law, whichever is lower.

3.4 Invoices are subject to a minimum invoice charge of one hundred Dollars ($100). The Member has the right to charge an administrative fee of up to Fifteen Dollars ($15) to re-issue an invoice.

3.5 The invoice settlement method is check, bank transfer or direct debit. Any other method of payment must receive prior agreement from the Member. The Client undertakes to provide bank account details.

3.6 The Member is entitled to require pre-payment of up to 100% of the quoted order price as a condition of acceptance.

3.7  Notwithstanding any provision of this Agreement to the contrary, charges for analytical services shall be paid in full, unless (i) such analytical services are cancelled or modified by the Client before the initiation of testing, or (ii) a change in rush status was instituted by the laboratory.

## 4. Duties of Client in Delivering Samples or Materials

4.1 The samples or materials must be in a condition that makes the preparation of reports/analyses or the production of ordered products possible without difficulty. The Member is entitled to conduct an initial examination of the samples or materials to check their condition before processing the samples, drawing up

EXHIBIT C



a report or using them in production. The Client shall bear the costs of this Initial examination, if the samples or materials do not comply with the requirements described in this clause 4.1. If the result of the initial examination is that an analysis or production is impossible or is possible only under more difficult conditions than originally anticipated - for example, because the samples or materials have been interspersed with foreign materials or substances that were not reported by the Client or are degraded – the Member shall be entitled to terminate or interrupt the order and the Client shall bear costs incurred by the Member to that point.

4.2 The Client must ensure, and hereby warrants, that no sample poses any danger, including on its site, during transportation, in the laboratory or otherwise to the Member's premises, instruments, personnel or representatives. It is the Client's responsibility to insure compliance with hazardous waste regulations, including regarding information, transportation and disposal and to inform the Member's personnel or representatives about sample health and safety concerns, including any known or suspected toxic or other contaminant that may be present in the sample and its likely level of contamination as well as the risks to the Member's premises, instruments, personnel and representatives related to the contamination. The Client shall be responsible for, and indemnifies the Member against, all costs, damages, liabilities and injuries that may be caused to or incurred by the Member or its personnel or representatives including on the sampling site, during the transportation or in the laboratory by the Client's sample or by sampling site conditions. The Client shall bear all extraordinary costs for adequate disposal of hazardous waste resulting from the sample, whether or not described as hazardous waste. At the Member's request, the Client must provide the Member with the exact composition of the samples.

## 5. Property Rights on Sample Material and Sample Storage

5.1 All samples become the property of the Member to the extent necessary for the performance of the order. Unless the Client pays for storage, the Member shall have no obligation or liability for samples sent to the Member for storage, including samples requiring refrigeration. If the Client pays for storage, the Member will take commercially reasonable steps to store the samples, according to professional practice.

5.2 The Member can dispose of or destroy samples immediately after the analysis has been performed, unless the Member and the Client have agreed in writing on the terms of the Member's retention of the sample. The Member also can dispose of or destroy the samples after the agreed upon retention period, without further notice and at Client's cost, should an extra cost for the Member arise to comply with any regulation (for example, with respect to disposal of hazardous waste). If the Client requests the return of unneeded sample material, the Member will return them to the Client, at the Client's cost and risk.

## 6. Delivery Dates, Turnaround Time

Delivery dates and turnaround times are estimates and do not constitute a commitment by the Member. Nevertheless, the Member shall make commercially reasonable efforts to meet its estimated deadlines.

6.1 Results are generally sent by email and/or by USPS mail, or via other electronic means, to the attention of the persons indicated by the Client in the order, promptly after the analysis is completed.

## 7. Transfer of Property and Intellectual Property Rights

7.1 Title in any analysis results, products, equipment, software or similar supplied by the Member to the Client will remain with the Member until all invoices in respect thereof have been paid by the Client in full, and until such full payment, the Client shall have no property rights or other rights to use them. In addition,

EXHIBIT C



even if the Member has accepted and begun to fulfil an order, the Member has the right at any time stop processing that order and to stop doing any work for a Client if that Client is late in paying any amount due to the Member, whether for that or any other order.

7.2 Even after payment in full by the Client, the Member shall retain the right to store, use and publish all analysis results in an anonymous form which does not identify the Client.

### 8. Limited Warranties and Responsibilities

8.1 Samples are analyzed by the Member in the condition in which the Member received the sample and in accordance with the current state of technology and methods developed and generally applied by the Member. As such, the results of Member's analyses may not always be 100% exact and/or relevant. Analyses, interpretations, assessments, consulting work and conclusions are prepared with a commercially reasonable degree of care but the Member cannot guarantee that results will always be correct or absolute. This limited warranty expires six months after the delivery date of the samples, if the acknowledgement of the order does not specifically state otherwise. In all cases, the Client must independently verify the validity of any results, interpretations, assessments and conclusions supplied by the Member, if it wishes to rely on the same in respect of matters of importance, and shall do so at its own risk.

8.2 Each analytical report relates exclusively to the sample analyzed by the Member. If the Member has not expressly been mandated and paid for the definition of the sampling plan (including which samples of which raw materials and finished products and at which frequency should be analyzed) and the definition of the precise range of analysis to be performed or if the Client has not followed the Member's recommendations, the Member shall not bear any responsibility if the sampling plan and/or the range of analysis to be performed prove to be insufficient or inappropriate.

8.3 The Client is responsible for the proper delivery of samples sent to the Member for examination/analyses or materials sent for production. Unless otherwise specifically agreed in writing by the Member, the Member accepts no responsibility for any loss or damage, which may occur to any sample in transit or to any facility or site where logistics services are being delivered. The Client will at all times be liable for the security, packaging and insurance of the sample from its dispatch until it is delivered to the offices or the laboratories of the Member. The Member will use commercially reasonable care in handling and storing samples, but the Member shall not be held responsible for any loss or destruction of samples even after their receipt at its laboratories.

8.4 Unless explicitly agreed in writing by all parties, the contractual relationship shall be exclusively between the Client and the Member. There shall be no third party beneficiary or collateral warranty relating to any order and the Client shall indemnify and hold the Member harmless from and against any and all third party claims in any way relating to the Client or to the order by the Client.

### 9. Indemnification and Limitation of Liability

9.1 Except to the extent that such limitations are not permitted or void under applicable law, where a Member performs Services for Client, and those Services result in a third party claim arising out of the gross negligence or willful misconduct of the Member providing the Services (a "Claim"), that Member shall indemnify, defend and hold harmless Client from and against those liabilities, costs, damages, suits, actions, debts, charges and expenses (including reasonable attorneys' fees, court costs and any amounts paid in settlement) that the Client shall at any time sustain as a direct result of the Claim.; provided, however, that the Member shall not be liable for any damages, losses, costs or expenses to the extent attributable to the negligence or willful misconduct of the Client.

EXHIBIT C



9.2 The Client shall defend, indemnify and hold harmless the Member and its employees, officers, successors, agents, representatives, successors and assigns from and against any losses, injuries, claims and costs which Member shall at any time suffer as a result of or arising from or in any way connected with its negligence, willful misconduct, or by the Client's sample or sampling site conditions, and by placing an order, the Client agrees to provide that indemnification.

9.3 In no event shall either party be responsible for any indirect, consequential, incidental, punitive or special damages (including without limitation damages for lost profits or revenue, loss of use, business interruption, loss of information, or for the procurement of substitute services) of the other party or of any third party, even if such party has been advised of the potential for such damages and whether such damages arise in contract, negligence, tort, under statute, in equity, at law or otherwise. In all cases, the Member's liability for any damages of the other party or of any third party shall be limited to the amount of fees paid by Client for the Services to which the claim or dispute relates.

## 10. Remedy for Deficient Services and Repeated Analysis

10.1 In the event that any services are improperly or inadequately performed by a Member, Client's sole remedy, and the Member's sole obligation, with respect to such deficient services shall be for Client to either:  (i) require the Member to re-perform such improper or deficient services, subject to the provisions of Section 10.2 below, or (ii) request a refund of all amounts paid to the Member for such improperly or inadequately performed services.

10.2 Objections to test results can be made within thirty (30) days after the Client receives the results. However, unless it would appear that the results of the repeated analysis do not match those of the first one, the Client shall bear the costs of the repeat testing or review. Furthermore, a repeated analysis will be possible only if the Member has a sufficient amount of the original sample on hand when it receives the Client's objection. Otherwise the Client will be required to pay all costs, including sampling, transportation, analytical and disposal costs for the repeat analysis.

## 11. Force Majeure

11.1 The Member cannot be held liable for delays, errors, damages or other problems caused by events or circumstances which are unforeseen or beyond the Member's reasonable control, or which result from compliance with governmental requests, laws and regulations.

## 12. Quality Statement

12.1 Where statements of conformity to a specification or standard for a test are included on an analytical report (e.g. pass/fail, in tolerance/out-of-tolerance), this decision shall be made based on the numerical result without consideration of the uncertainty of the result unless otherwise agreed to in writing by the Member and the Client, and set forth in an addendum to these Terms.

## 12. Confidentiality & Processing of Client Data

12.1 The Member shall be entitled to save and process personal or commercial data received from the Client in any way, no matter whether such data stem from the Client directly or from a third party and shall use commercially reasonable efforts to keep such data confidential, in compliance with applicable law.

EXHIBIT C



12.2 The Member shall use commercially reasonable efforts to keep all analysis results and service reports confidential, subject to the Member' rights set forth in clause 7.2 and the right to use them in order to demonstrate its entitlement to payment for services rendered.

12.3 Analysis results are prepared and supplied exclusively for the use of the Client and should not be divulged to a third party for any purposes without the prior written agreement of the Member. In addition, the Client is required to maintain secrecy concerning all services provided by the Member and their results as well as the composition of products and software delivered by the Member. Analysis results are not to be publicly disclosed or exploited without the prior written consent of the Member. Even if such written consent is given by the Member, the Client (a) remains responsible for any consequences due to the divulgence of such results to a third party and any reliance of such third party on such results and (b) hereby agrees to Indemnify the Member against any liability which the Member may incur as a result of such divulgence or any such third party reliance.

## 13. Disclaimer and Miscellaneous

13.1 EXCEPT AS EXPRESSLY SET FORTH IN THESE TERMS, THE MEMBER MAKES NO WARRANTIES, EXPRESS OR IMPLIED, IN CONNECTION WITH ITS PERFORMANCE OF SERVICES AND, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE MEMBER SPECIFICALLY DISCLAIMS ANY AND ALL OTHER WARRANTIES, WHETHER WRITTEN OR ORAL, OR EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF SUITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

13.2 These Terms may be modified in writing from time to time by the Member and orders will be governed by the most recent version of these Terms that is in effect at the time the Member accepts the order.

13.3 Should a court waive, limit or hold to be invalid, illegal or unenforceable any part of these Terms, all other parts shall still apply to the greatest extent possible.

13.4 Failure by either the Member or the Client to exercise the rights under these Terms shall not constitute a waiver or forfeiture of such rights.

## 14. Governing Law/ Jurisdiction

The construction, validity and performance of these Terms shall be governed by the laws and the commercial courts of the State in which the registered office of the Member which accepted the order in question is located (including in cases involving multiple counsels for the defense or third party respondents), which shall have exclusive jurisdiction.

EXHIBIT C



**15. Comments and Exceptions**

List any comments or mutually agreeable exceptions to the General Terms and Conditions of Sale:

[INSERT COMMENTS AND EXCEPTIONS HERE, IF ANY]

**Eurofins Approval of Exceptions (Only necessary if exceptions have been made)**

By:_____

Name: _____

Title: _____

Date: _____

**CLIENT (Initial Each Page & Sign Below)**

By:_____

Name: _____

Title: _____

Date: _____

EXHIBIT C

EXHIBIT D



**General Terms & Conditions of Sale - December 2009**

### 1. Area of Application

1.1 All Orders accepted by Eurofins Scientific, Inc. or any of its subsidiaries or affiliates (collectively, "ES") will be governed by these General Terms and Conditions of Sales (the "Terms and Conditions"), including orders placed by telephone which have not been confirmed in writing and orders made by delivery of samples. A contract with these Terms and Conditions comes into being when an order that has been placed with ES is accepted by ES. An order placed with ES is considered as accepted by ES when (a) ES proceeds to fulfill that order, without need for any written confirmation from ES or (b) ES accepts the order in writing.

1.2 These Terms and Conditions supersede and replace all prior verbal or written price quotations and agreements between the parties and, unless specifically indicated otherwise therein, take precedence over all conflicting or inconsistent provisions of subsequent written agreements between the parties. No officer (other than the Chief Executive Officer of ES), employee, agent or subcontractor of ES has the authority to alter or waive any of these Terms and Conditions or to make any representation which conflicts with or purports to override any of these Terms and Conditions; and no such alteration, waiver or representation shall be binding upon ES, unless it is in writing and signed by the Chief Executive Officer of ES.

### 2. Placement of Order

2.1 A customer's order will be valid only if it is sent by mail or fax or other electronic message on letterhead of the customer or by using ES-approved sample dispatch sheets or electronic order forms and the commercial aspects of the order which are not specifically set out in these Terms and Conditions (including price, estimated turnaround times and delivery date) must be agreed at the time of the order. The customer must confirm in writing orders given by telephone immediately after they are made and will be deemed to have placed an order if the customer sends samples to ES quoting the customer reference. ES is not obligated to start any analytical work unless the order is clear and it has been provided all required information.

2.2 Unless specifically accepted in writing and signed by the Chief Executive Officer of ES, any terms proposed or submitted by a customer at any time (including, but not limited to, terms or provisions in the customer's purchase order, instructions or other document) which differ from these Terms and Conditions are rejected as a material alteration of these Terms and Conditions and shall be of no force or effect. Furthermore, special terms or conditions of prior orders, including special pricing, will not automatically apply to subsequent orders. Each order accepted by ES will be treated as a separate contract between ES and the customer.

2.3 ES is entitled to charge management and administrative fees of up to Twenty Five Dollars ($25) in connection with the request for additional services to an existing order. A request for additional services on samples that have entered the laboratory will be treated as a new order and may postpone estimated delivery date accordingly.

EXHIBIT D



2.4 Any logistic service off-site of the laboratory must be paid in full, unless it has been cancelled or modified by the customer at least forty eight hours (48) in advance for collection services, ninety six (96) hours in advance for sampling services and one (1) week in advance for auditing services.

### 3. Price and Terms of Payment

3.1 If the acknowledgment of an order does not state otherwise, ES' prices apply "ex works", excluding packaging, which is charged separately. Any additional cost or disbursement (e.g. incurred by ES in connection with the order) must be paid by the customer.

3.2. Prices are exclusive of all applicable taxes (including sales, use and VAT) and are based on tariffs in force at the day of the remittance of the offer to the customer. Applicable taxes are those in force at the date of invoicing.

3.3 Unless specifically agreed otherwise by ES in its acceptance of an order, payment of all invoices is due strictly within 30 days of the invoice date. Any dispute about invoices must be raised within 30 days of the invoice date. The challenge of an analytical result will not entitle a customer to defer payment. Any invoice which remains outstanding after due date, may be additionally charged with an administrative penalty of Seventy Five Dollars ($75) and may carry interest at the rate of one percent (1%) per month or the maximum interest rate permitted by applicable law, whichever is lower.

3.4 Invoices are subject to a minimum invoice charge of one hundred Dollars ($100). ES has the right to charge an administrative fee of up to Fifteen Dollars ($15) to re-issue an invoice.

3.5 The invoice settlement method is check, bank transfer or direct debit. Any other method of payment must receive prior agreement from ES. The customer undertakes to provide bank account details.

3.6 ES is entitled to require payment of up to 100% of the quoted order price as a condition of acceptance.

### 4. Duties of Customer in Delivering Samples or Materials

4.1 The samples or materials must be in a condition that makes the preparation of reports/analyses or the production of ordered products possible without difficulty. ES is entitled to conduct an initial examination of the samples or materials to check their condition before processing the samples, drawing up a report or using them in production. The customer shall bear the costs of this initial examination, if the samples or materials do not comply with the requirements described in this clause 4.1. If the result of the initial examination is that an analysis or production is impossible or is possible only under more difficult conditions than originally anticipated – for example, because the samples or materials have been interspersed with foreign materials or substances that were not reported by the customer or are degraded – ES shall be entitled to terminate or interrupt the order and the customer shall bear costs incurred by ES to that point.



4.2 The customer must ensure, and hereby warrants, that no sample poses any danger, including on its site, during transportation, in the laboratory or otherwise to ES premises, instruments, personnel or representatives. It is the customer's responsibility to insure compliance with hazardous waste regulations, including regarding information, transportation and disposal and to inform ES personnel or representatives about sample health and safety concerns, including any known or suspected toxic or other contaminant that may be present in the sample and its likely level of contamination as well as the risks to ES premises, instruments, personnel and representatives related to the contamination. The customer shall be responsible for, and indemnifies ES against, all costs, damages, liabilities and injuries that may be caused to or incurred by ES or its personnel or representatives including on the sampling site, during the transportation or in the laboratory by the customer's sample or by sampling site conditions. The customer shall bear all extraordinary costs for adequate disposal of hazardous waste resulting from the sample, whether or not described as hazardous waste. At ES' request, the customer must provide ES with the exact composition of the samples.

### 5. Property Rights on Sample Material and Sample Storage

5.1 All samples become the property of ES to the extent necessary for the performance of the order. Unless the customer pays for storage, ES shall have no obligation or liability for samples sent to ES for storage, including samples requiring refrigeration. If the customer pays for storage, ES will take commercially reasonable steps to store the samples, according to professional practice.

5.2 ES can dispose of or destroy samples immediately after the analysis has been performed, unless ES and the customer have agreed in writing on the terms of ES' retention of the sample. ES also can dispose of or destroy the samples after the agreed upon retention period, without further notice and at customer's cost, should an extra cost for ES arise to comply with any regulation (for example, with respect to disposal of hazardous waste). If the customer requests the return of unneeded sample material, ES will return them to the customer, at the customer's cost and risk.

### 6. Delivery Dates, Turnaround Time

6.1 Delivery dates and turnaround times are estimates and do not constitute a commitment by ES. Nevertheless, ES shall make commercially reasonable efforts to meet its estimated deadlines.

6.2 Results are generally sent by email and/or by USPS mail, or via other electronic means, to the attention of the persons indicated by the customer in the order, promptly after the analysis is completed.

### 7. Transfer of Property

7.1 Title in any analysis results, products, equipment, software or similar supplied by ES to the customer will remain with ES until all invoices in respect thereof have been paid by the customer in full, and until such full payment, the customer shall have no property rights or other rights to use them. In addition, even if ES has accepted and begun to fulfill an order, ES has the right at any time stop processing that order and to stop doing any work for a customer if that customer is late in paying any amount due to ES, whether for that or any other order.

EXHIBIT D



7.2 Even after payment in full by the customer, ES shall retain the right to store, use and publish all analysis results in an anonymous form which does not identify the customer.

### 8. Limited Warranties and Responsibilities

8.1 Orders are handled in the conditions available to ES in accordance with the current state of technology and methods developed and generally applied by ES and the results may not always be 100% exact and/ or relevant. Analysis, interpretations, assessments, consulting work and conclusions are prepared with a commercially reasonable degree of care but ES cannot guarantee that these will always be correct or absolute. This limited warranty expires six months after the delivery date of the samples, if the acknowledgement of the order does not specifically state otherwise. In all cases, the customer must independently verify the validity of any results, interpretations, assessments and conclusions supplied by ES, if it wishes to rely on the same in respect of matters of importance and shall do so at its own risk.

8.2 Each analytical report relates exclusively to the sample analyzed by ES. If ES has not expressly been mandated and paid for the definition of the sampling plan (including which samples of which raw materials and finished products and at which frequency should be analyzed) and the definition of the precise range of analysis to be performed or if the customer has not followed ES recommendations, ES shall not bear any responsibility if the sampling plan and/or the range of analysis to be performed prove to be insufficient or inappropriate.

8.3 The customer is responsible for the proper delivery of samples sent to ES for examination/analyses or materials sent for production. Unless otherwise specifically agreed in writing by ES, ES accepts no responsibility for any loss or damage, which may occur to any sample in transit or to any facility or site where logistics services are being delivered. The customer will at all times be liable for the security, packaging and insurance of the sample from its dispatch until it is delivered to the offices or the laboratories of ES. ES will use commercially reasonable care in handling and storing samples, but ES shall not be held responsible for any loss or destruction of samples even after their receipt at its laboratories.

8.4 The customer warrants and represents to ES that all samples sent to ES for analysis are safe and in a stable condition and undertakes to indemnify ES for any losses, injuries, claims and costs which ES, or its personnel, may suffer as a result of any sample not being in a safe or stable condition, notwithstanding that the customer may have given an indication on the sample or any order form of any perceived problem with the sample. The customer must always inform ES in writing prior to shipment and label the packaging, samples and/ or containers appropriately, if the samples are dangerous or otherwise of a hazardous nature.

8.5 Unless explicitly agreed in writing by all parties, the contractual relationship shall be between the customer and ES. There shall be no third party beneficiary or collateral warranty relating to any order and the customer shall indemnify and hold ES harmless from and against any and all third party claims in any way relating to the customer or order by the customer.

EXHIBIT D



**9 Limitation of Liability**

9.1 Except to the extent that such limitations are not permitted or void under applicable law: (a) ES (together with its workers, office clerks, employees, representatives, managers, officers, directors, agents and consultants and all ES partners and affiliates, the "ES Indemnifying Parties") shall be liable only for the proven direct and immediate damage caused by the ES Indemnifying Party's willful misconduct in connection with the performance of an order and then, only if ES has received written notice thereof not later than six (6) months after the date of the customer's knowledge of the relevant claim (unless any longer period is prescribed under applicable law and cannot be contractually limited), and (b) in all cases (whether arising under contract, tort, negligence, strict liability, through indemnification or otherwise), the ES Indemnifying Parties' liability per claim or series of related claims, and the customer's exclusive remedy, with respect to ES' services which fall under these Terms and Conditions, shall be limited to the <u>lesser of:</u> (i) the direct and immediate loss or damage caused by the ES Indemnifying Party's willful misconduct in connection with the performance of the order and (ii) ten times the amount ES actually received from the customer in relation to the order up to fifteen thousand dollars ($15,000).

9.2 The ES Indemnifying Parties shall not be liable for any indirect, direct or consequential loss or damage (including, but not limited to, loss of business, profits, goodwill, and business opportunities or similar) incurred by the customer or by any third party.

9.3 It is a condition of ES' acceptance of an order that the customer indemnifies the ES Indemnifying Parties for any losses, injuries, claims and costs which the ES Indemnifying Parties may suffer as a result of arising from or in any way connected with its role under or services or products or software provided pursuant to these Terms and Conditions, except to the extent that the ES Indemnifying Parties are required to bear them according to these Terms and Conditions, and by placing an order the customer agrees to provide that indemnification.

## 10.  Repeated Analysis

Objections to test results can be made within thirty (30) days after the customer receives the results. However, unless it would appear that the results of the repeated analysis do not match those of the first one, the customer shall bear the costs of the repeat testing or review. Furthermore, a repeated analysis will be possible only if ES has a sufficient amount of the original sample on hand when it receives the customer's objection. Otherwise the customer will be required to pay all costs, including sampling, transportation, analytical and disposal costs for the repeat analysis.

## 11.  Force Majeure

ES cannot be held liable for delays, errors, damages or other problems caused by events or circumstances which are unforeseen or beyond ES' reasonable control, or which result from compliance with governmental requests, laws and regulations.

## 12.  Confidentiality & Processing of Customer Data



12.1 ES shall be entitled to save and process personal or commercial data received from the customer in any way, no matter whether such data stem from the customer directly or from a third party and shall use commercially reasonable efforts to keep such data confidential, in compliance with applicable law.

12.2 ES shall use commercially reasonable efforts to keep all analysis results and service reports confidential, subject to ES' rights set forth in clause 7.2 and the right to use them in order to demonstrate its entitlement to payment for services rendered.

12.3 Analysis results are prepared and supplied exclusively for the use of the customer and should not be divulged to a third party for any purposes without the prior written agreement of ES. In addition, the customer is required to maintain secrecy concerning all services provided by ES and their results as well as the composition of products and software delivered by ES. Analysis results are not to be publicly disclosed or exploited without the prior written consent of ES. Even if such written consent is given by ES, the customer (a) remains responsible for any consequences due to the divulgence of such results to a third party and any reliance of such third party on such results and (b) hereby agrees to indemnify the ES Indemnified Parties against any liability which the ES Indemnified Parties may incur as a result of such divulgence or any such third party reliance.

## 13.  Disclaimer and Miscellaneous

13.1 **ALL TERMS, CONDITIONS AND WARRANTIES (INCLUDING ANY IMPLIED WARRANTY AS TO MERCHANTABLE QUALITY OR FITNESS FOR A PARTICULAR PURPOSE) AS TO THE MANNER, QUALITY AND TIMING OF THE TESTING SERVICE AND RESULTS, EQUIPMENT, PRODUCTS OR SOFTWARE SUPPLIED BY ES ARE EXCLUDED TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW. THE WARRANTIES, OBLIGATIONS AND LIABILITIES OF ES CONTAINED IN THESE TERMS AND CONDITIONS ARE EXCLUSIVE.**

13.2 These Terms and Conditions may be modified in writing from time to time by ES and orders will be governed by the most recent version of these Terms and Conditions that is in effect at the time ES accepts the order.

13.3 Should a court waive, limit or hold to be invalid, illegal or unenforceable any part of these Terms and Conditions, all other parts shall still apply to the greatest extent possible.

13.4 Failure by either ES or the customer to exercise the rights under these Terms and Conditions shall not constitute a waiver or forfeiture of such rights.

## 14.  Governing Law/ Jurisdiction

14.1 The construction, validity and performance of these Terms and Conditions shall be governed by the laws and the commercial courts of Des Moines, Polk County, Iowa, in which the registered office of the ES company which accepted the order in question is located (including in cases involving multiple counsels for the defense or third-party respondents), which shall have exclusive jurisdiction.

EXHIBIT E



**General Terms & Conditions of Sale**

## 1. Area of Application

1.1 All Orders accepted by Eurofins Scientific, Inc., Eurofins Analytical Laboratories, Inc., Eurofins Microbiology Laboratories, Inc., Eurofins DQCI, LLC, Eurofins Craft Technologies, Inc. and Eurofins SF Analytical Laboratories, Inc., which includes the additional business lines of Eurofins Nutritional Analysis Center, Eurofins Supplement Analysis Center, Eurofins Food Safety Services, Eurofins Grain Testing, Eurofins Central Analytical Laboratories and Eurofins Genescan, or any of their subsidiaries or Affiliates (as hereinafter defined) (each, individually, a "Member" and all Members hereinafter collectively referred to as the "US Food Entity") from the undersigned ("Client") will be governed by these General Terms and Conditions of Sale (the "Terms"), including orders placed by telephone which have not been confirmed in writing and orders made by delivery of samples. A contract with these Terms comes into being when an order that has been placed with any Member of the US Food Entity, and the order is accepted by such Member of US Food Entity. An order placed with a Member of US Food Entity is considered as accepted by such Member of US Food Entity when (a) the Member proceeds to fulfil that order, without need for any written confirmation from the Member or (b) the Member accepts the order in writing.

1.2 These Terms supersede and replace all prior verbal or written price quotations and agreements between the parties and, unless specifically indicated otherwise therein, take precedence over all conflicting or inconsistent provisions of subsequent written agreements between the parties. No employee, agent or subcontractor, other than the authorized officer(s) of the Members, has the authority to alter or waive any of these Terms or to make any representation which conflicts with or purports to override any of these Terms; and no such alteration, waiver or representation shall be binding upon any Member, unless it is in writing and signed by an authorized officer of the Member.

1.3 For the purpose of the foregoing, "Affiliate" shall mean any corporation or other business entity directly or indirectly controlled by, controlling, or under common control with any Member of US Food Entity and/or Client.  The term "control" (including, with correlative meaning, the terms "controlled by," "controlling" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a party, whether through the ownership of voting securities, by contract or otherwise, or such other relationship as, in fact, constitutes actual control.

1.4 US Food Entity is not a separate and distinct entity, but rather a group of independent affiliated laboratories that perform food and feed testing services for the purpose of providing safety, composition, authenticity, origin, traceability and purity of food (the "Services"). The Members and their respective Affiliates, and Client and its Affiliates, are separate and distinct legal entities.  In no event shall any Member or its Affiliates, be jointly and severally liable with any other Member or any other Affiliates of any Member, in any respect under this Agreement, nor be deemed to have any obligation with respect to any other Member's or Affiliate's performance or non-performance of any obligation under this Agreement.

## 2. Placement of Order

2.1 Client's order will be valid only if it is sent by mail or fax or other electronic message on letterhead of the Client or by using US Food Entity-approved sample dispatch sheets or electronic order forms and the commercial aspects of the order which are not specifically set out in these Terms (Including price, estimated turnaround times and delivery date) must be agreed at the time of the order. Client must confirm in writing orders given by telephone immediately after they are made and will be deemed to have placed an order if Client sends samples to a Member quoting the Client reference. The Member is not obligated to start any analytical work unless the order is clear and it has been provided with all

Page **1** of **6**

EXHIBIT E



required information.

2.2 Unless specifically accepted in writing and signed by an authorized officer of the Member, any terms proposed or submitted by a Client at any time (including, but not limited to, terms or provisions in the Client's purchase order, instructions or other document) which differ from these Terms are rejected as a material alteration of these Terms and shall be of no force or effect. Furthermore, special terms or conditions of prior orders, including special pricing, will not automatically apply to subsequent orders. Each order accepted by a Member will be treated as a separate and independent contract between such Member and the Client.

2.3 The Member is entitled to charge management and administrative fees of up to Twenty-Five Dollars ($25) in connection with the request for additional services to an existing order. A request for additional services on samples that have entered the laboratory will be treated as a new order and may postpone estimated delivery date accordingly.

2.4 Any logistic service off-site of the laboratory must be paid in full, unless it has been cancelled or modified by the Client at least forty-eight hours (48) in advance for collection services, ninety-six (96) hours in advance for sampling services and one (1) week in advance for auditing services.

### 3. Price and Terms of Payment
3.1 If the acknowledgment of an order does not state otherwise, the Member's prices apply "ex works", excluding packaging, which is charged separately. Any additional cost or disbursement (e.g. Incurred by the Member in connection with the order) must be paid by the Client.

3.2. Prices are exclusive of all applicable taxes (including sales, use and VAT) and are based on tariffs in force at the day of the remittance of the offer to the Client. Applicable taxes are those in force at the date of invoicing.

3.3 Unless specifically agreed otherwise by the Member in its acceptance of an order, payment of all invoices is due strictly within 30 days of the invoice date; any dispute about invoices must be raised within 30 days of the invoice date, by providing written notice to Member with reasonable detail of the dispute. The challenge of an analytical result will not entitle the Client to defer payment. Any invoice which remains outstanding after due date, may be additionally charged with an administrative penalty of Seventy-Five Dollars ($75) and may carry interest at the rate of one percent (1%) per month or the maximum interest rate permitted by applicable law, whichever is lower.

3.4 Invoices are subject to a minimum invoice charge of one hundred Dollars ($100). The Member has the right to charge an administrative fee of up to Fifteen Dollars ($15) to re-issue an invoice.

3.5 The invoice settlement method is check, bank transfer or direct debit. Any other method of payment must receive prior agreement from the Member. The Client undertakes to provide bank account details.

3.6 The Member is entitled to require pre-payment of up to 100% of the quoted order price as a condition of acceptance.

### 4. Duties of Client in Delivering Samples or Materials
4.1 The samples or materials must be in a condition that makes the preparation of reports/analyses or the production of ordered products possible without difficulty. The Member is entitled to conduct an initial examination of the samples or materials to check their condition before processing the samples, drawing up a report or using them in production. The Client shall bear the costs of this Initial examination, if the samples or materials do not comply with the requirements described in this clause 4.1. If the result of the

5988412.5



initial examination is that an analysis or production is impossible or is possible only under more difficult conditions than originally anticipated - for example, because the samples or materials have been interspersed with foreign materials or substances that were not reported by the Client or are degraded – the Member shall be entitled to terminate or interrupt the order and the Client shall bear costs incurred by the Member to that point.

4.2 The Client must ensure, and hereby warrants, that no sample poses any danger, including on its site, during transportation, in the laboratory or otherwise to the Member's premises, instruments, personnel or representatives. It is the Client's responsibility to insure compliance with hazardous waste regulations, including regarding information, transportation and disposal and to inform the Member's personnel or representatives about sample health and safety concerns, including any known or suspected toxic or other contaminant that may be present in the sample and its likely level of contamination as well as the risks to the Member's premises, instruments, personnel and representatives related to the contamination. The Client shall be responsible for, and indemnifies the Member against, all costs, damages, liabilities and injuries that may be caused to or incurred by the Member or its personnel or representatives including on the sampling site, during the transportation or in the laboratory by the Client's sample or by sampling site conditions. The Client shall bear all extraordinary costs for adequate disposal of hazardous waste resulting from the sample, whether or not described as hazardous waste. At the Member's request, the Client must provide the Member with the exact composition of the samples.

## 5. Property Rights on Sample Material and Sample Storage
5.1 All samples become the property of the Member to the extent necessary for the performance of the order. Unless the Client pays for storage, the Member shall have no obligation or liability for samples sent to the Member for storage, including samples requiring refrigeration. If the Client pays for storage, the Member will take commercially reasonable steps to store the samples, according to professional practice.

5.2 The Member can dispose of or destroy samples immediately after the analysis has been performed, unless the Member and the Client have agreed in writing on the terms of the Member's retention of the sample. The Member also can dispose of or destroy the samples after the agreed upon retention period, without further notice and at Client's cost, should an extra cost for the Member arise to comply with any regulation (for example, with respect to disposal of hazardous waste). If the Client requests the return of unneeded sample material, the Member will return them to the Client, at the Client's cost and risk.

## 6. Delivery Dates, Turnaround Time
Delivery dates and turnaround times are estimates and do not constitute a commitment by the Member. Nevertheless, the Member shall make commercially reasonable efforts to meet its estimated deadlines.

6.1 Results are generally sent by email and/or by USPS mall, or via other electronic means, to the attention of the persons indicated by the Client in the order, promptly after the analysis is completed.

## 7. Transfer of Property and Intellectual Property Rights
7.1 Title in any analysis results, products, equipment, software or similar supplied by the Member to the Client will remain with the Member until all invoices in respect thereof have been paid by the Client in full, and until such full payment, the Client shall have no property rights or other rights to use them. In addition, even if the Member has accepted and begun to fulfil an order, the Member has the right at any time stop processing that order and to stop doing any work for a Client if that Client is late in paying any amount due to the Member, whether for that or any other order.

7.2 Even after payment in full by the Client, the Member shall retain the right to store, use and publish all analysis results in an anonymous form which does not identify the Client.

5988412.5
EXHIBIT E



**8. Limited Warranties and Responsibilities**

8.1 Samples are analyzed by the Member in the condition in which the Member received the sample and in accordance with the current state of technology and methods developed and generally applied by the Member. As such, the results of Member's analyses may not always be 100% exact and/or relevant. Analyses, interpretations, assessments, consulting work and conclusions are prepared with a commercially reasonable degree of care but the Member cannot guarantee that results will always be correct or absolute. This limited warranty expires six months after the delivery date of the samples, if the acknowledgement of the order does not specifically state otherwise. In all cases, the Client must independently verify the validity of any results, interpretations, assessments and conclusions supplied by the Member, if it wishes to rely on the same in respect of matters of importance, and shall do so at its own risk.

8.2 Each analytical report relates exclusively to the sample analyzed by the Member. If the Member has not expressly been mandated and paid for the definition of the sampling plan (including which samples of which raw materials and finished products and at which frequency should be analyzed) and the definition of the precise range of analysis to be performed or if the Client has not followed the Member's recommendations, the Member shall not bear any responsibility if the sampling plan and/or the range of analysis to be performed prove to be insufficient or inappropriate.

8.3 The Client is responsible for the proper delivery of samples sent to the Member for examination/analyses or materials sent for production. Unless otherwise specifically agreed in writing by the Member, the Member accepts no responsibility for any loss or damage, which may occur to any sample in transit or to any facility or site where logistics services are being delivered. The Client will at all times be liable for the security, packaging and insurance of the sample from its dispatch until it is delivered to the offices or the laboratories of the Member. The Member will use commercially reasonable care in handling and storing samples, but the Member shall not be held responsible for any loss or destruction of samples even after their receipt at its laboratories.

8.4 Unless explicitly agreed in writing by all parties, the contractual relationship shall be exclusively between the Client and the Member. There shall be no third party beneficiary or collateral warranty relating to any order and the Client shall indemnify and hold the Member harmless from and against any and all third party claims in any way relating to the Client or to the order by the Client.

**9. Indemnification and Limitation of Liability**

9.1 Except to the extent that such limitations are not permitted or void under applicable law, where a Member performs Services for Client, and those Services result in a third party claim arising out of the gross negligence or willful misconduct of the Member providing the Services (a "Claim"), that Member shall indemnify, defend and hold harmless Client from and against those liabilities, costs, damages, suits, actions, debts, charges and expenses (including reasonable attorneys' fees, court costs and any amounts paid in settlement) that the Client shall at any time sustain as a direct result of the Claim.; provided, however, that the Member shall not be liable for any damages, losses, costs or expenses to the extent attributable to the negligence or willful misconduct of the Client.

9.2 The Client shall defend, indemnify and hold harmless the Member and its employees, officers, successors, agents, representatives, successors and assigns from and against any losses, injuries, claims and costs which Member shall at any time suffer as a result of or arising from or in any way connected with its negligence, willful misconduct, or by the Client's sample or sampling site conditions, and by placing an order, the Client agrees to provide that indemnification.

5988412.5

EXHIBIT E



9.3 In no event shall either party be responsible for any indirect, consequential, incidental, punitive or special damages (including without limitation damages for lost profits or revenue, loss of use, business interruption, loss of information, or for the procurement of substitute services) of the other party or of any third party, even if such party has been advised of the potential for such damages and whether such damages arise in contract, negligence, tort, under statute, in equity, at law or otherwise. In all cases, the Member's liability for any damages of the other party or of any third party shall be limited to the amount of fees paid by Client for the Services to which the claim or dispute relates.

**10. Remedy for Deficient Services and Repeated Analysis**

10.1 In the event that any services are improperly or inadequately performed by a Member, Client's sole remedy, and the Member's sole obligation, with respect to such deficient services shall be for Client to either:  (i) require the Member to re-perform such improper or deficient services, subject to the provisions of Section 10.2 below, or (ii) request a refund of all amounts paid to the Member for such improperly or inadequately performed services.

10.2 Objections to test results can be made within thirty (30) days after the Client receives the results. However, unless it would appear that the results of the repeated analysis do not match those of the first one, the Client shall bear the costs of the repeat testing or review. Furthermore, a repeated analysis will be possible only if the Member has a sufficient amount of the original sample on hand when it receives the Client's objection. Otherwise the Client will be required to pay all costs, including sampling, transportation, analytical and disposal costs for the repeat analysis.

**11. Force Majeure**

11.1 The Member cannot be held liable for delays, errors, damages or other problems caused by events or circumstances which are unforeseen or beyond the Member's reasonable control, or which result from compliance with governmental requests, laws and regulations.

**12. Confidentiality & Processing of Client Data**

12.1 The Member shall be entitled to save and process personal or commercial data received from the Client in any way, no matter whether such data stem from the Client directly or from a third party and shall use commercially reasonable efforts to keep such data confidential, in compliance with applicable law.

12.2 The Member shall use commercially reasonable efforts to keep all analysis results and service reports confidential, subject to the Member' rights set forth in clause 7.2 and the right to use them in order to demonstrate its entitlement to payment for services rendered.

12.3 Analysis results are prepared and supplied exclusively for the use of the Client and should not be divulged to a third party for any purposes without the prior written agreement of the Member. In addition, the Client is required to maintain secrecy concerning all services provided by the Member and their results as well as the composition of products and software delivered by the Member. Analysis results are not to be publicly disclosed or exploited without the prior written consent of the Member. Even if such written consent is given by the Member, the Client (a) remains responsible for any consequences due to the divulgence of such results to a third party and any reliance of such third party on such results and (b) hereby agrees to Indemnify the Member against any liability which the Member may incur as a result of such divulgence or any such third party reliance.

**13. Disclaimer and Miscellaneous**

13.1 EXCEPT AS EXPRESSLY SET FORTH IN THESE TERMS, THE MEMBER MAKES NO WARRANTIES, EXPRESS OR IMPLIED, IN CONNECTION WITH ITS PERFORMANCE OF

EXHIBIT E



SERVICES AND, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE MEMBER SPECIFICALLY DISCLAIMS ANY AND ALL OTHER WARRANTIES, WHETHER WRITTEN OR ORAL, OR EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF SUITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

13.2 These Terms may be modified in writing from time to time by the Member and orders will be governed by the most recent version of these Terms that is in effect at the time the Member accepts the order.

13.3 Should a court waive, limit or hold to be invalid, illegal or unenforceable any part of these Terms, all other parts shall still apply to the greatest extent possible.

13.4 Failure by either the Member or the Client to exercise the rights under these Terms shall not constitute a waiver or forfeiture of such rights.

**14. Governing Law/ Jurisdiction**
The construction, validity and performance of these Terms shall be governed by the laws and the commercial courts of the State in which the registered office of the Member which accepted the order in question is located (including in cases involving multiple counsels for the defense or third party respondents), which shall have exclusive jurisdiction.

**CLIENT**

_____
Client Name

_____
Authorized Name & Title (Please Print)

_____
Authorized Signature

_____
Date

EXHIBIT F

QA 0005384

## ❖ eurofins

Page 1 of **3**

# NEW ACCOUNT APPLICATION

Company Name: BIG HEART PET BRANDS

Contact Person: MATTHEW HALL

Send Report to: MATTHEW HALL
<sub>NAME</sub>
375 NORTH SHORE DR
<sub>ADDRESS</sub>
PITTSBURGH PA 15212
<sub>CITY, STATE & ZIP</sub>

Phone Number: 412-222-8833                Fax: 412-222-1636

Official Hard Copy Report and Electronic Report:        Electronic Report Only: ✕

E-Mail Address for Electronic Reporting: Matthew.hall@bigheartpet.com

Send Invoice to: MATTHEW HALL
<sub>NAME</sub>
SAME AS ABOVE
<sub>ADDRESS</sub>

<sub>CITY, STATE & ZIP</sub>

Hard Copy Invoice and Electronic Invoice:        Electronic Invoice Only: ✕

E-Mail Address for Electronic Invoicing: SAME AS ABOVE

Other Instructions: _____

## EUROFINS ACCOUNT STATUS

If you currently do business with another Eurofins location, please specify the division and your Customer ID.

Eurofins Division: _____        Customer ID (If Available) _____

If not, how did you learn about us?        Internet search        Print advertisement        Tradeshow/Exposition
<sub>PLEASE CHECK MOST APPROPRIATE CHOICE.</sub>

Please note that all divisions of Eurofins operate independently, as separate cost centers, *with different remittance details and tax IDs. If you are an existing client of another Eurofins division, please establish our division as a separate vendor so payment is directed to the proper lockbox or bank account.*

A payment option form with remit information and W-9 can be provided to you upon request by contacting:
**LauraForet@eurofinsus.com (Eurofins Central Analytical Lab)**
or
**CaronMcCray@eurofinsus.com (Eurofins GeneScan)**

If you are an **existing client** of another Eurofins division and your account is in good standing, **prepayment is not required.**

If you are **NOT** an established client of another Eurofins division, **prepayment for our services IS REQUIRED by check, wire transfer, or credit card** until credit can be established, unless otherwise approved by the Laboratory Director.

**Please read the General Terms and Conditions on pages 2 and 3 and sign on page 3 acknowledging your understanding and agreement to these terms.**

---

Eurofins Analytical Laboratories, Inc., dba Eurofins Central Analytical Laboratories and Eurofins GeneScan
2219 Lakeshore Drive, Suite 500 ECAL, Suite 400 GeneScan, New Orleans, LA 70122 USA
Central Analytical Laboratories * Telephone 1-504-297-3400 * Fax 1-504-297-3410
GeneScan * Telephone 1-504-297-4330 * Fax 1-504-297-4335

EXHIBIT F

 **eurofins**

General Terms & Conditions of Sale

**1.  Area of Application**

1.1 All Orders accepted by "Eurofins Analytical Laboratories, Inc., dba Eurofins GeneScan and Eurofins Central Analytical Laboratories, or any of its subsidiaries or affiliates" (collectively, "EAL") will be governed by these General Terms and Conditions of Sales (the "Terms and Conditions"), including orders placed by telephone which have not been confirmed in writing and orders made by delivery of samples. A contract with these Terms and Conditions comes into being when an order that has been placed with EAL is accepted by EAL. An order placed with EAL is considered as accepted by EAL when (a) EAL proceeds to fulfill that order, without need for any written confirmation from EAL or (b) EAL accepts the order in writing.

1.2 These Terms and Conditions supersede and replace all prior verbal or written price quotations and agreements between the parties and, unless specifically indicated otherwise therein, take precedence over all conflicting or inconsistent provisions of subsequent written agreements between the parties. No officer (other than the Board of Directors of EAL), employee, agent or subcontractor of EAL has the authority to alter or waive any of these Terms and Conditions or to make any representation which conflicts with or purports to override any of these Terms and Conditions; and no such alteration, waiver or representation shall be binding upon EAL, unless it is in writing and signed by the Board of Directors of EAL.

**2.  Placement of Order**

2.1 A customer's order will be valid only if it is sent by mail or fax or other electronic message on letterhead of the customer or by using EAL-approved sample dispatch sheets or electronic order forms and the commercial aspects of the order which are not specifically set out in these Terms and Conditions (including price, estimated turnaround times and delivery date) must be agreed at the time of the order. The customer must confirm in writing orders given by telephone immediately after they are made and will be deemed to have placed an order if the customer sends samples to EAL quoting the customer reference. EAL is not obligated to start any analytical work unless the order is clear and it has been provided all required information.

2.2 Unless specifically accepted in writing and signed by the Board of Directors of EAL, any terms proposed or submitted by a customer at any time (including, but not limited to, terms or provisions in the customer's purchase order, instructions or other document) which differ from these Terms and Conditions are rejected as a material alteration of these Terms and Conditions and shall be of no force or effect. Furthermore, special terms or conditions of prior orders, including special pricing, will not automatically apply to subsequent orders. Each order accepted by EAL will be treated as a separate contract between EAL and the customer.

2.3 EAL is entitled to charge management and administrative fees of up to Twenty-Five Dollars ($25) in connection with the request for additional services to an existing order. A request for additional services on samples that have entered the laboratory will be treated as a new order and may postpone the estimated delivery date accordingly.

2.4 Any logistic service off-site of the laboratory must be paid in full, unless it has been cancelled or modified by the customer at least forty-eight hours (48) in advance for collection services, ninety-six (96) hours in advance for sampling services and one (1) week in advance for auditing services.

**3.  Price and Terms of Payment**

3.1 If the acknowledgment of an order does not state otherwise, EAL' prices apply "ex works", excluding packaging, which is charged separately. Any additional cost or disbursement (e.g. incurred by EAL in connection with the order) must be paid by the customer.

3.2 Prices are exclusive of all applicable taxes (including sales, use and VAT) and are based on tariffs in force at the day of the remittance of the offer to the customer. Applicable taxes are those in force at the date of invoicing.

3.3 Unless specifically agreed otherwise by EAL in its acceptance of an order, payment of all invoices is due strictly within 30 days of the invoice date. Any dispute about invoices must be raised within 30 days of the invoice date. The challenge of an analytical result will not entitle a customer to defer payment. Any invoice which remains outstanding after due date, may be additionally charged with an administrative penalty of Seventy-Five Dollars ($75) and may carry interest at the rate of one percent (1%) per month or the maximum interest rate permitted by applicable law, whichever is lower.

3.4 Invoices are subject to a minimum invoice charge of One Hundred Dollars ($100). EAL has the right to charge an administrative fee of up to Fifteen Dollars ($15) to re-issue an invoice.

3.5 The invoice settlement method is check, bank transfer or direct debit. Any other method of payment must receive prior agreement from EAL. The customer undertakes to provide bank account details.

3.6 EAL is entitled to require payment of up to 100% of the quoted order price as a condition of acceptance.

**4.  Duties of Customer in Delivering Samples or Materials**

4.1 The samples or materials must be in a condition that makes the preparation of reports/analyses or the production of ordered products possible without difficulty. EAL is entitled to conduct an initial examination of the samples or materials to check their condition before processing the samples, drawing up a report or using them in production. The customer shall bear the costs of this initial examination, if the samples or materials do not comply with the requirements described in this clause 4.1. If the result of the initial examination is that an analysis or production is impossible or is possible only under more difficult conditions than originally anticipated – for example, because the samples or materials have been interspersed with foreign materials or substances that were not reported by the customer or are degraded – EAL shall be entitled to terminate or interrupt the order and the customer shall bear costs incurred by EAL to that point.

4.2 The customer must ensure, and hereby warrants, that no sample poses any danger, including on its site, during transportation, in the laboratory or otherwise to EAL premises, instruments, personnel or representatives. It is the customer's responsibility to insure compliance with hazardous waste regulations,

including regarding information, transportation and disposal and to inform EAL personnel or representatives about sample health and safety concerns, including any known or suspected toxic or other contaminant that may be present in the sample and its likely level of contamination as well as the risks to EAL premises, instruments, personnel and representatives raised in the transportation. The customer shall be responsible for, and indemnifies EAL against, all costs, damages, liabilities and injuries that may be caused to or incurred by EAL or its personnel or representatives including on the sampling site, during the transportation or in the laboratory by the customer's sample or by sampling site conditions. The customer shall bear all extraordinary costs for adequate disposal of hazardous waste resulting from the sample, whether or not described as hazardous waste. At EAL' request, the customer must provide EAL with the exact composition of the samples.

**5.  Property Rights on Sample Material and Sample Storage**

5.1 All samples become the property of EAL to the extent necessary for the performance of the order. Unless the customer pays for storage, EAL shall have no obligation or liability for samples sent to EAL for storage, including samples requiring refrigeration. If the customer pays for storage, EAL will take commercially reasonable steps to store the samples, according to professional practice.

5.2 EAL can dispose of or destroy samples immediately after the analysis has been performed, unless EAL and the customer have agreed in writing on the terms of EAL' retention of the sample. EAL also can dispose of or destroy the samples after the agreed upon retention period, without further notice and at customer's cost, should an extra cost for EAL arise to comply with any regulation (for example, with respect to disposal of hazardous waste). If the customer requests the return of unneeded sample material, EAL will return them to the customer, at the customer's cost and risk.

**6.  Delivery Dates, Turnaround Time**

6.1 Delivery dates and turnaround times are estimates and do not constitute a commitment by EAL. Nevertheless, EAL shall make commercially reasonable efforts to meet its estimated deadlines.

6.2 Results are generally sent by email and/or by USPS mail, or via other electronic means, to the attention of the persons indicated by the customer in the order, promptly after the analysis is completed.

**7.  Transfer of Property**

7.1 Title in any analysis results, products, equipment, software or similar supplied by EAL to the customer will remain with EAL until a division in respect thereof have been paid by the customer in full, and until such full payment, the customer shall have no property rights or other rights to use them. In addition, even if EAL has accepted and begun to fulfill an order, EAL has the right at any time to stop processing that order and to stop doing any work for a customer if that customer is late in paying any amount due to EAL, whether for that or any other order.

7.2 Even after payment in full by the customer, EAL shall retain the right to store, use and publish all analysis results in an anonymous form which does not identify the customer.

**8.  Limited Warranties and Responsibilities**

8.1 Orders are handled in the conditions available to EAL in accordance with the current state of technology and methods developed and generally applied by EAL and the results may not always be 100% exact and/ or relevant. Analysis, interpretations, assessments, consulting work and conclusions are prepared with a commercially reasonable degree of care but EAL cannot guarantee that these will always be correct or absolute. This limited warranty expires six months after the delivery date of the samples, if the acknowledgement of the order does not specifically state otherwise. In all cases, the customer must independently verify the validity of any results, interpretations, assessments and conclusions supplied by EAL, if it wishes to rely on the same in respect of matters of importance and shall do so at its own risk.

8.2 Each analytical report relates exclusively to the sample analyzed by EAL. If EAL has not expressly been mandated and paid for the definition of the sampling plan (including which samples of which raw materials and finished products and at which frequency should be analyzed) and the definition of the precise range of analysis to be performed or if the customer has not followed EAL recommendations, EAL shall not bear any responsibility if the sampling plan and/or the range of analysis to be performed prove to be insufficient or inappropriate.

8.3 The customer is responsible for the proper delivery of samples sent to EAL for examination/analyses or materials sent for production. Unless otherwise specifically agreed in writing by EAL, EAL accepts no responsibility for any loss or damage, which may occur to any sample in transit or to any facility or site where logistics services are being delivered. The customer will at all times be liable for the security, packaging and insurance of the sample from its dispatch until it is delivered to the offices or the laboratories of EAL. EAL will use commercially reasonable care in handling and storing samples, but EAL shall not be held responsible for any loss or destruction of samples even after their receipt at its laboratories.

8.4 The customer warrants and represents to EAL that all samples sent to EAL for analysis are safe and in a stable condition and undertakes to indemnify EAL for any losses, injuries, claims and costs which EAL, or its personnel, may suffer as a result of any sample not being in a safe or stable condition, notwithstanding that the customer may have given an indication on the sample or any order form of any perceived problem with the sample. The customer must always inform EAL in writing prior to shipment and label the packaging, samples and/or containers appropriately, if the samples are dangerous or otherwise of a hazardous nature.

8.5 Unless explicitly agreed in writing by all parties, the contractual relationship shall be between the customer and EAL. There shall be no third party beneficiary or collateral warranty relating to any order and the customer shall indemnify and hold EAL harmless from and against any and all third party claims in any way relating to the customer or order by the customer.

**9.  Limitation of Liability**

9.1 Except to the extent that such limitations are not permitted or void under applicable law: (a) EAL (together with its workers, office clerks, employees, representatives, managers, officers, directors, agents and consultants and all EAL partners and affiliates, the "EAL Indemnifying Parties") shall be liable only for the proven direct and immediate damage caused by the EAL Indemnifying Party's willful misconduct in connection with the performance of an order and then, only if EAL has received notice thereof not

---

Eurofins Analytical Laboratories, Inc., dba Eurofins Central Analytical Laboratories and Eurofins GeneScan
2219 Lakeshore Drive,  Suite 500 ECAL, Suite 400 GeneScan, New Orleans, LA  70122 USA
Central Analytical Laboratories * Telephone 1-504-297-3400 * Fax 1-504-297-3410
GeneScan * Telephone 1-504-297-4330 * Fax 1-504-297-4335



later than six (6) months after the date of the customer's knowledge of the relevant claim (unless any longer period is prescribed under applicable law and cannot be contractually limited), and (b) in all cases (whether arising under contract, tort, negligence, strict liability, through indemnification or otherwise), the EAL Indemnifying Parties' liability per claim or series of related claims, and the customer's exclusive remedy, with respect to EAL' services which fall under these Terms and Conditions, shall be limited to the lesser of: (i) the direct and immediate loss or damage caused by the EAL Indemnifying Party's willful misconduct in connection with the performance of the order and (ii) ten times the amount EAL actually received from the customer in relation to the order up to fifteen thousand dollars ($15,000).

9.2 The EAL Indemnifying Parties shall not be liable for any indirect, direct or consequential loss or damage (including, but not limited to, loss of business, profits, goodwill, business opportunities or similar) incurred by the customer or by any third party.

9.3 It is a condition of EAL' acceptance of an order that the customer indemnifies the EAL Indemnifying Parties for any losses, injuries, claims and costs which the EAL Indemnifying Parties may suffer as a result of arising from or in any way connected with its role under or services or products or software provided pursuant to these Terms and Conditions, except to the extent that the EAL Indemnifying Parties are required to bear them according to these Terms and Conditions, and by placing an order the customer agrees to provide that indemnification.

10.  Repeated Analysis

Objections to test results can be made within thirty (30) days after the customer receives the results. However, unless it would appear that the results of the repeated analysis do not match those of the first one within the limits of measurement uncertainties, the customer shall bear the costs of the repeat testing or review. Furthermore, a repeated analysis will be possible only if EAL has a sufficient amount of the original sample on hand when it receives the customer's objection. Otherwise the customer will be required to pay all costs, including sampling, transportation, analytical and disposal costs for the analysis of a new sample.

11.  Force Majeure

EAL cannot be held liable for delays, errors, damages or other problems caused by events or circumstances which are unforeseen or beyond EAL' reasonable control, or which result from compliance with governmental requests, laws and regulations.

12.  Confidentiality & Processing of Customer Data

12.1 EAL shall be entitled to save and process personal or commercial data received from the customer in any way, no matter whether such data stem from the customer directly or from a third party and shall use commercially reasonable efforts to keep such data confidential, in compliance with applicable law.

12.2 EAL shall use commercially reasonable efforts to keep all analysis results and service reports confidential, subject to EAL' rights set forth in clause 7.2 and the right to use them in order to demonstrate its entitlement to payment for services rendered.

12.3 Analysis results are prepared and supplied exclusively for the use of the customer and should not be divulged to a third party for any purposes without the prior written agreement of EAL. In addition, the customer is required to maintain secrecy concerning all services provided by EAL and their results as well as the composition of products and software delivered by EAL. Analysis results are not to be publicly disclosed or exploited without the prior written consent of EAL. Even if such written consent is given by EAL, the customer (a) remains responsible for any consequences due to the divulgence of such results to a third party and any reliance of such third party on such results and (b) hereby agrees to indemnify the EAL Indemnified Parties against any liability which the EAL Indemnified Parties may incur as a result of such divulgence or any such third party reliance.

13.  Disclaimer and Miscellaneous

13.1 ALL TERMS, CONDITIONS AND WARRANTIES (INCLUDING ANY IMPLIED WARRANTY AS TO MERCHANTABLE QUALITY OR FITNESS FOR A PARTICULAR PURPOSE) AS TO THE MANNER, QUALITY AND TIMING OF THE TESTING SERVICE AND RESULTS, EQUIPMENT, PRODUCTS OR SOFTWARE SUPPLIED BY EAL ARE EXCLUDED TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW.  THE WARRANTIES, OBLIGATIONS AND LIABILITIES OF EAL CONTAINED IN THESE TERMS AND CONDITIONS ARE EXCLUSIVE.

13.2 These Terms and Conditions may be modified in writing from time to time by EAL and orders will be governed by the most recent version of these Terms and Conditions that is in effect at the time EAL accepts the order.

13.3 Should a court waive, limit or hold to be invalid, illegal or unenforceable any part of these Terms and Conditions, all other parts shall still apply to the greatest extent possible.

13.4 Failure by either EAL or the customer to exercise the rights under these Terms and Conditions shall not constitute a waiver or forfeiture of such rights.

14.  Governing Law/Jurisdiction

The construction, validity and performance of these Terms and Conditions shall be governed by the laws of the State of Iowa and the commercial courts of the city of Des Moines, Polk County, (including cases involving multiple counsels for the defense or third-party respondents), which shall have exclusive jurisdiction.

MATTHEW I. HALL

AUTHORIZED NAME (PLEASE PRINT)

AUTHORIZED SIGNATURE

MANAGER – CORPORATE QA

POSITION

10/21/14

DATE

| LIMS Code | CRM | By |
| --- | --- | --- |

Eurofins Analytical Laboratories, Inc., dba Eurofins Central Analytical Laboratories and Eurofins GeneScan
2219 Lakeshore Drive,  Suite 500 ECAL, Suite 400 GeneScan, New Orleans, LA  70122 USA
Central Analytical Laboratories * Telephone 1-504-297-3400 * Fax 1-504-297-3410
GeneScan * Telephone 1-504-297-4330 * Fax 1-504-297-4335

EXHIBIT F